UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **Cristian Ramos,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) No. 20 C 1001 |
| v. | ) |
| | ) Judge Rebecca R. Pallmeyer |
| **O. Rodriguez, B. Knudsen, L. Max,** | ) |
| **T. Barner, and D. Houston,** | ) |
| | ) |
| **Defendants.** | ) |

### MEMORANDUM OPINION AND ORDER

Plaintiff Cristian Ramos filed this civil rights action under 42 U.S.C. § 1983, claiming that the Defendants, officers at the Cook County Jail, treated him with excessive force on February 28, 2018, when he was a pretrial detainee at the Jail. The Defendants have moved for summary judgment, arguing that (1) their use of force was not objectively unreasonable, (2) the Prison Litigation Reform Act bars Ramos's suit because he suffered no physical injury, and (3) they are entitled to qualified immunity. For the reasons set forth below, the motion is denied.

### PROCEDURAL HISTORY

The court previously screened Ramos's *pro se* complaint under 28 U.S.C. § 1915A. The complaint survived initial screening [10] and the parties engaged in discovery. Defendants have now moved for summary judgment. [52–61, 75–76]. Ramos has responded with a a response to the Defendants' statement of facts, a statement of additional facts, a responsive memorandum of law, and several affidavits that he prepared and signed. [73].

### BACKGROUND[1]

Ramos is an inmate of the Illinois Department of Corrections who is currently incarcerated at Menard Correctional Center. (Defs.' SOF ¶¶ 1–2.) As of February 28, 2018, Ramos was a

---

[1] The facts recited below are taken primarily from the parties' Local Rule 56.1 submissions. (*See* Defs.' Statement of Undisputed Facts [52] (hereinafter "Defs.' SOF"); Pl.'s Resp. to Defs.' SOF [73] (hereinafter "Pl.'s SOF Resp."); Pl.'s Statement of Additional Facts [73]

1

pretrial detainee housed in the Cook County Department of Corrections (the "Jail") in Chicago, Illinois. (*Id.* ¶¶ 2, 12.) At that time, Defendant Orlando Rodriguez was employed as a Sergeant at the Jail (Ex. E to Defs.' SOF ¶ 3), while Defendants Luis Max, Timothy Barner, Bradley Knudsen, and Darryl Houston were employed as Correctional Officers at the facility (Ex. F to Defs.' SOF ¶ 1; Ex. G to Defs.' SOF ¶ 1; Ex. H to Defs.' SOF ¶ 2; Defs.' SOF ¶ 7).

The altercation giving rise to this suit occurred while Ramos was moving his belongings from one tier of the Jail to another. (Defs.' SOF ¶¶ 20–21.) Ramos was not physically restrained with handcuffs or shackles, but was escorted by several officers, with Defendants Barner and Max closest behind him. (*Id.* ¶¶ 21, 26; Security-Camera Footage at 15:45–16:00.) As Ramos retrieved his belongings from his old cell, Defendant Knudsen and another inmate stood idly near a set of showers that were located between that cell and a set of doors through which Ramos was expected to exit momentarily. (Defs.' SOF ¶¶ 22–23.) As Ramos approached these two men, he suddenly lunged toward the other inmate and attempted to strike him in the face. (*Id.* ¶¶ 22, 25.)[2] Several officers, including all the Defendants except for Houston, quickly converged on Ramos and attempted to wrestle him to the ground. (*Id.* ¶¶ 27–32.) For a few seconds, Ramos latched onto Defendant Knudsen's arms and refused his orders to let go, while Defendant Barner attempted to take Ramos down by grabbing his legs. (*Id.* ¶¶ 28–30.) Shortly thereafter, Defendant Knudsen struck Ramos in the head with his knee. (*Id.* ¶ 31.) After Ramos had been brought to the ground and was lying prone, the officers attempted to place him in handcuffs. (*Id.* ¶¶ 32–35.) In succession during this process, Defendant Knudsen struck Ramos's body with his hand (*id.* ¶ 33), Defendant Max sprayed a burst of pepper spray toward Ramos's face (*id.* ¶ 34),

---

(hereinafter "Pl.'s Add. SOF"); Defs.' Resp. to Pl.'s Add. SOF [76].) The court has also carefully reviewed the two pieces of video evidence introduced by the Defendants. (*See* Ex. C to Defs.' SOF [52-3, 62] (hereinafter "Security-Camera Footage"); Ex. D to Defs.' SOF [52-4, 62] (hereinafter "Body-Camera Footage"); *see also* Business Records Decl. [60].)

[2] Ramos explained during his deposition that he believed the other inmate had stolen some of his belongings. (*See* Ramos Dep., Ex. B to Defs.' SOF [52-2] 32:9–42:9.)

and Defendant Rodriguez deployed a taser into Ramos's back (*id.* ¶ 35).  (*See also* Security-Camera Footage at 16:00–17:05; Body-Camera Footage at 0:00–0:50.)

The defendants claim that they took these measures because Ramos continued to act aggressively and refused to be handcuffed.  (Defs.' SOF ¶¶ 32–35.)  Ramos, on the other hand, maintains that he "was never being aggressive" and that he did not refuse to surrender his hands.  (Pl.'s SOF Resp. ¶¶ 32–33.)  Ramos says that he was trying to tell the officers to let him go (*id.* ¶ 32); that he was making noises due to the pain he was experiencing while lying on his stomach (*id.* ¶ 33); and that he temporarily blacked out after he was pepper sprayed (*id.* ¶ 34).[3]

Once Ramos had been handcuffed, several officers, including all the Defendants, escorted him to a decontamination station in the Jail's basement, where his face was flushed with water.  (Body-Camera Footage at 0:45–3:20.)  He was then taken to the Jail's dispensary for medical treatment.  (Defs.' SOF ¶¶ 37–38.)  Ramos claims that, in transit, the escorting officers "shoved [his] head against [a] door to open it," struck him in the head, and pulled his hair.  (Pl.'s SOF Resp. ¶ 39.)  The Defendants dispute those claims.  (Defs.' SOF ¶ 39.)

Ramos was briefly assessed by medical staff in the Jail's dispensary.  (*See* Defs.' SOF ¶ 40.)  In the notes summarizing that visit, a nurse wrote the following:  "Tazed in the lower back on the left side, no injuries noted.  Just eyes burning cleared and instructed to keep eyes open.  Return to tier with officer escort."  (*Id.*; *see also* Ex. I to Defs.' SOF [52-9].)  Ramos claims that the nurse who saw him failed to examine his injuries thoroughly.  (Pl.'s Add. SOF ¶ 6.)  In fact, he says, his injuries included "a swelled up ear as well as scratches on ear, knot/bump on the side of [his] head and the back of [his] head with minor scratches, and bruising on [his] ribs and back as well as minor scratches on [his] back and back arms, immense head pain, as well as back

---

[3] Ramos also claims that he was already handcuffed by the time that Defendant Rodriguez deployed the taser.  (Pl.'s SOF Resp. ¶ 35.)  But because the body-camera footage clearly shows otherwise, the court does not credit Ramos's version of the facts on this issue.  *See Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

pain, and nerve pain and open wound from [taser] that bled, as well as mental and emotional damages PTSD, depression, anxiety." (*Id.* ¶ 8 (citing Ramos Dep., Ex. B to Defs.' SOF [52-2] 82:17–84:2, 89:1–6).)

## **LEGAL STANDARD**

The standards that govern a motion for summary judgment are familiar. The court should grant such a motion only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts should draw all inferences in favor of the nonmoving party, but a nonmovant is "not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "the nonmoving party must set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1011–12 (7th Cir. 2018) (citing *Matsushita*, 475 U.S. at 587). "If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate." *Boss*, 816 F.3d at 916.

## **DISCUSSION**

As noted, the Defendants argue that they are entitled to summary judgment because (1) their use of force was not objectively unreasonable, (2) Ramos suffered no physical injury, and (3) they are entitled to qualified immunity. (*See* Defs.' Mot. for Summary Judgment [54] (hereinafter "Defs.' Mot.") at 5.) The court finds disputes of fact that preclude summary judgment on any of these grounds.

**I.  Defendants' Use of Force**

The Fourteenth Amendment's Due Process Clause protects pretrial detainees like Ramos from the application of excessive force by government officers. *Forrest v. Prine*, 620 F.3d 739,

4

743–44 (7th Cir. 2010). Because pretrial detainees are presumed to be innocent, "the punishment model is inappropriate for them." *Miranda v. County of Lake*, 900 F.3d 335, 350–51 (7th Cir. 2018). The Supreme Court has therefore "disapproved the uncritical extension of Eighth Amendment jurisprudence to the pretrial setting." *Id.* at 351 (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). Under *Kingsley*, a pretrial detainee alleging excessive force need not establish that the officer was subjectively aware that the force being used was unreasonable. Instead, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396.

Determining whether force was objectively unreasonable turns on "the totality of facts and circumstances" in a case. *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018). In addressing Defendants' arguments that the force they used in this case was not excessive, the court considers such factors as "[1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 396. As the Seventh Circuit has explained, "summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).

This case warrants exactly such caution, as the parties have presented significantly different versions of the facts, particularly regarding Ramos's behavior after he had been wrestled to the floor. Ramos does not dispute that he attacked another inmate or that the Defendants' initial decision to subdue him was warranted. But he claims that he had already been effectively subdued by the time he was pepper sprayed and tased (and, of course, by the time he was being escorted in handcuffs afterwards). The timing of events is crucial because "[f]orce is reasonable only when exercised in proportion to the threat posed, and as the threat changes, so too should

5

the degree of force." *Cyrus*, 624 F.3d at 863 (citation omitted); *see also Abbott v. Sangamon County*, 705 F.3d 706, 729 (7th Cir. 2013) ("[T]he fact that an initial use of force may have been justified does not mean that all subsequent uses of that force were similarly justified."). The Defendants insist that once Ramos had been brought to the ground, he refused to surrender his hands and continued to act aggressively. But based on the evidence presented, the court finds that a reasonable jury could conclude that the Defendants' various uses of force—both when Ramos was being placed in handcuffs and when he was being escorted through the Jail afterwards—were objectively unreasonable given the level of resistance that Ramos offered and the threat that he posed.

In addition to the parties' testimony, there is video evidence of this episode from a security camera stationed in the Jail and body camera worn by Defendant Rodriguez. But the video evidence does not shed significant light on the issue of the reasonableness of the use of force in this case. The security-camera footage shows the scene from a high angle, at a significant distance, and without sound. And once Ramos was on the ground, at least two officers stood between Ramos and the camera, blocking the view and preventing assessment of the type and degree of force being applied. (*See generally* Security-Camera Footage at 16:00–17:05.) The body-camera footage is also limited: throughout the duration of the video (i.e., when the officers were attempting to place Ramos in handcuffs and when they were escorting him, in handcuffs, through the Jail), the camera does not always point at Ramos or at the Defendants allegedly applying force. Additionally, the first thirty seconds of the body-camera footage have no sound, and even after the sound begins, various background noises make it difficult to understand what Ramos might be saying. (*See generally* Body-Camera Footage at 0:00–5:30.)

Given the significant, unresolved factual disputes in this case, the court cannot conclude as a matter of law that the force used by any of the Defendants was objectively reasonable. The single exception is Defendant Houston. To be liable under § 1983, an individual must have caused or participated in a constitutional deprivation. *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th

Cir. 2021). The video evidence shows that Defendant Houston was not directly involved in the physical altercation between Ramos and Defendants Rodriguez, Knudsen, Max, and Barner. Although he was present throughout much of the incident, Defendant Houston stood to the side and did not exercise any of the ostensibly excessive force. He thus cannot be liable for excessive force under § 1983.

In his response filings, Ramos seems to acknowledge that Defendant Houston did not use any force. He argues instead that Defendant Houston should be held liable for failing to intervene to prevent the other Defendants' uses of force. (Pl.'s SOF Resp. ¶ 19 ("[A] realistic opportunity to interve[ne] was present."); Pl.'s Memo. in Opp. [73] at 8–9 ("Sgt. Houston had more than a realistic opportunity to prevent a[n] officer from violating [Ramos's] rights.").)

The Defendants reply that Ramos forfeited this failure-to-intervene argument because he did not raise it before summary judgment. (Defs.' Reply [75] at 2 n.1.) But that contention ignores a key distinction in the federal pleading rules. There is, in fact, no bright-line prohibition on "arguments raised for the first time at summary judgment." *See Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017). Under the Federal Rules of Civil Procedure, "it is factual allegations, not legal theories, that must be pleaded in a complaint." *Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014); *see also Rabé v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011) ("A complaint need not identify legal theories, and specifying an incorrect theory is not a fatal error."). Thus, "[w]hen a new argument is made in summary judgment briefing, the correct first step is to consider whether it changes the complaint's factual theory, or just the legal theories plaintiff has pursued so far." *Chessie Logistics*, 867 F.3d at 860. In other words, the court should determine whether a new argument relies on "'an alternative legal characterization'" of the complaint's facts or instead relies on "a new fact." *Id.* at 861 (quoting *Whitaker*, 772 F.3d at 808–09). If the new argument reflects a new fact, the court "has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims." *Id.* But if the new argument merely refines the plaintiff's legal theory, the court should generally allow it, barring

7

the possibility of unwanted circumstances like unreasonable delay or substantially increased litigation costs. *Id.*

The court finds that the factual basis for Ramos's failure-to-intervene argument was already implied in his complaint, meaning that his argument is simply an alternative legal characterization of existing facts. A bystander may be held liable under § 1983 if they "(1) had reason to know that a fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring"). *See Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). It is true that Ramos's complaint alleges that Houston, along with the rest of the Defendants, was a direct perpetrator of various uses of force. (*See, e.g.*, Compl. [11] at 4 ("Ofc. L. Max, Ofc. Barner[,] Ofc. B. Knudsen, and Sgt. D. Houston along with Sgt. O. Rodriguez were punching me and kicking me[,] pulling my hair[,] and had handcuffed me and had me subdued . . . ."); *id.* at 5 ("Sgt. D. Houston and Ofc. Max . . . [and] Ofc. Knudsen [escorted] me off the tier smashing my head against the door to open it causing me pain.").) But, in the context of such allegations, it naturally follows that any given participant, like Defendant Houston, "(1) had reason to know that a fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring." *See Lewis*, 581 F.3d at 472.

Ramos's complaint that did not precisely assign specific actions to specific Defendants. But this is understandable: Ramos was lying prone when he was hit, pepper sprayed, and tased, and he generally faced downwards when he was ushered through the Jail in handcuffs. (*See* Security-Camera Footage at 16:00–17:30; Body-Camera Footage at 0:00–5:30.) Video footage produced by the Defendants in discovery sheds more light on the nature of each Defendant's involvement. In the court's view, Ramos was "entitled to refine [his legal] theory at summary judgment based on evidence produced in discovery." *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 743 (7th Cir. 2015). Because Defendants are jointly represented, the court sees no unfair prejudice in declining to dismiss Defendant Houston at this stage.

## II. Physical Injury

The PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The Defendants argue that Ramos's suit is "barred" because he "has no injury under the PLRA." (Defs.' Mot. at 10 (capitalization altered).) This appears to be an overstatement. Section 1997e(e) precludes an inmate from seeking compensatory damages for mental or emotional injuries without establishing a physical injury. *See Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003). Although Ramos does indeed seek compensatory damages for mental and emotional injuries (including depression and post-traumatic stress disorder), he *also* claims various physical injuries, including headaches and wounds. And even if Ramos did not suffer any physical injury, the PLRA would foreclose only compensatory damages; it would not bar the suit or prevent him from obtaining nominal or punitive damages. *See id.* at 940–41; *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012). Summary judgment is thus not appropriate on this basis.

## II. Qualified Immunity

Lastly, the Defendants argue that even if they used excessive force, they are entitled to qualified immunity because Ramos's right was not clearly established at the time of the altercation. Again, the court disagrees. Qualified immunity shields government officials from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine that an official is protected by qualified immunity, the court asks "first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021). "If either inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019).

Because Ramos's excessive force claim survives this motion, the court turns to the question of whether the specific right violated was clearly established at the time of the Defendants' violation. A constitutional right is clearly established if "the right in question [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) (internal quotation marks omitted). A plaintiff can make this showing either "by presenting a closely analogous case that establishes that the Defendants' conduct was unconstitutional or by presenting evidence that the Defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010). Particularly when a plaintiff pursues the first option (i.e., presenting a closely analogous case), the court "must define the right in question with a sufficient degree of particularity." *Kingsley v. Hendrickson*, 801 F.3d 828, 832 (7th Cir. 2015) (noting in a similar context that "the scope of the right in issue must be drawn more narrowly than the right of a pretrial detainee to be free from excessive force during his detention").

As explained above, a reasonable jury could conclude that the force the Defendants used was objectively unreasonable and thus constitutionally excessive under the Fourteenth Amendment. And the court finds that Ramos's right to be free from such force was clearly established at the time of the altercation on February 28, 2018. As noted, Ramos does not suggest that the Defendants' threshold decision to use force was objectively unreasonable, but he asserts that the force persisted—and in some ways escalated—beyond the point of objective reasonableness. As the Seventh Circuit has explained, it is clearly established that officers may not "use significant force on non-resisting or passively resisting suspects." *Abbott*, 705 F.3d 706 at 732. More to the point, "[p]ermitting substantial *escalation* of force in response to passive non-compliance would be incompatible with our excessive force doctrine and would likely bring more injured citizens before our courts." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 527 (7th Cir. 2012) (emphasis added); *see also Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (explaining that

10

this prohibition applies even where a detainee previously refused to comply with officers' orders or even posed a threat to officer safety).

Pepper spray and tasers are both significant forms of force. *See, e.g.*, *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018) (explaining the "guidepost" rule that "an officer may not use significant force (like a Taser) against a nonresisting or passively resisting subject" (internal quotation marks omitted)); *Brooks v. City of Aurora*, 653 F.3d 478, 486 (7th Cir. 2011) (describing "gratuitous or unprovoked" uses of pepper spray as excessive). Under Ramos's version of the facts, which the court finds plausible given its review of the evidence, Ramos was, at most, passively resisting by the time that the pepper spray and taser were deployed and by the time that Ramos was later being escorted through the Jail.

The court thus finds that the Defendants are not entitled to summary judgment on the basis of qualified immunity.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [54] is denied.

ENTER:

Dated: January 31, 2022

_____
REBECCA R. PALLMEYER
United States District Judge